**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **FLOYD POWERS,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:21-cv-01195** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| **ANDREW EDDY,** | : | **Magistrate Judge Elizabeth P. Deavers** |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

Plaintiff Floyd Powers, an inmate committed to the custody of the Ohio Department of Rehabilitation and Correction ("ODRC"), has suffered from a large incisional hernia since fall 2018. He brings suit against Defendant Dr. Andrew Eddy, the State Medical Director for ODRC, regarding decisions that Dr. Eddy made about Powers' medical care, pursuant to 42 U.S.C. § 1983. This matter is now before the Court on Defendant's Motion for Summary Judgment. (*See* ECF No. 32). For the reasons set forth more fully below, the Court **DENIES** Defendant's motion.

### I.      BACKGROUND

#### A.      Factual Background[1]

Floyd Powers is an inmate at the London Correctional Institution ("LCI"), who suffers from chronic obstructive pulmonary disease ("COPD"), diabetes, atrial fibrillation, and an enormous incisional hernia. On September 6, 2018, he underwent an appendectomy at the Madison Community Hospital ("MCH"). Soon after the surgery, Dr. Matthew Chase, a physician at LCI, noticed a nontender bulge to the right of Power's umbilicus on October 1, 2018. (Ex. D at

---

[1] The Court confines its discussion of the facts to the period from October 2018 to April 2019, touching only briefly upon facts after April 2019, as that is the period at issue in the Complaint.

45, ECF No. 32-4).  The bulge—which turned out to be the incisional hernia at the center of this

case—appeared to extend well beyond the margins of his surgical scar.  At the time, Dr. Chase did

not recommend any further action be taken.[2]  (*Id.*).  Little had changed when Powers saw Dr. Chase

again at the end of the month,[3] but Dr. Chase started expressing greater concern during a third visit

on November 6, 2018.  (*See id.* at 49–52).  Accordingly, Dr. Chase ordered a surgical consult for

the hernia.  (*Id.* at 51).  Requests for specialty consultation appointments for ODRC inmates must

be approved through the Collegial Review process, which, apparently, consists of little more than

a decision by Dr. Eddy.  (*See* Declaration of Dr. Matthew Chase ("Chase Decl.") ¶ 4,[4] ECF No.

40-2; *see also* Def.'s Mot. for Summ. J. at 7 n.5, ECF No. 42).  Dr. Chase's recommendation for

a surgical consult was approved, and Powers saw Dr. Steven Sun, a surgical resident at The Ohio

State University ("OSU") Wexner Medical Center on November 26, 2019.

---

[2] Defendant writes that Dr. Chase did not request a surgery consult "perhaps because Mr. Powers was already morbidly obese, weighing in at 258 pounds." (Def.'s Mot. for Summ. J. at 7, ECF No. 32).  This is entirely speculative, as there is no evidence in the record as to the intent behind Dr. Chase's decision.

[3] Dr. Chase's notes from this visit described the bulge as follows:

> Large incisional hernai [sic] noted.  Can be identified through his shirt without difficulty.  On inspection, the vertical incision can be identified.  There is a bulge from the incision site extending laterally for perhaps 12".  On palpation of the sagging contents of the hernia, I believe it is bowel that I can palpate.  BS active.  Not particularly tender.

(Ex. D at 47, ECF No. 32-4).

[4] Defendant argues that the Declaration of Dr. Chase is, at least in part, an untimely expert opinion that must be excluded pursuant to the April 15, 2022, deadline for primary expert disclosures set by this Court.  (*See* Order, ECF No. 19).  The Court concurs, as the declaration was not filed until attached to Plaintiff's opposition brief.  (*See* Pl.'s Resp. in Opp'n, ECF No. 40).  The Court will still consider the declaration for facts within Dr. Chase's personal knowledge.  Some of the statements that Defendant has described as "opinions" are more properly characterized as factual statements of Dr. Chase's recollection of past events, decisions, and rationales.  These include: in paragraph 5, that "[i]t was clear that medical imaging was necessary to evaluate the hernia"; in paragraph 6, that Dr. Chase "fully concurred with the recommendation for a CT so that proper surgical planning could be done, particularly for consideration of anchoring mesh into the ribs and pelvis"; in paragraph 8, that "[t]he ultimate results of the ultrasound were totally unhelpful.  The readings were so deficient that they showed virtually nothing"; in paragraph 9, that "Dr. Eddy . . . documented no rationale for the course of action he mandated." (*See* Chase Decl. ¶¶ 5, 6, 8, 9, ECF No. 40-4).  These passages set forth how he analyzed the situation at the time, and are not post hoc expert opinions.

Dr. Sun requested a CT scan of Powers' abdomen and pelvis "to further delineate where the incisional hernia is for surgical planning" and suggested that the issue would require further consultation with the Complex Hernia Group at the Wexner Medical Center,[5] led by Dr. Daniel Eiferman. (Pl.'s Ex. D at 4, ECF No. 40-4). Dr. Sun's "Assessment/Plan" includes a prescription for what Powers would have to do "once [he] is scheduled for surgery." (*Id.*). Dr. Sherman Katz, Dr. Sun's supervisor, reviewed the findings and agreed with Dr. Sun's assessment: he wrote that Powers "needs imaging" and approved Dr. Sun's request to refer Powers to the Complex Hernia clinic at OSU and order for a "CT scan abdomen and pelvis with GI and IC contrast." (Def.'s Ex. D at 53, ECF No. 32-4).

But Dr. Sun's request, which Dr. Chase echoed after seeing Powers again on November 29, 2018, was denied by Collegial Review, which authorized an ultrasound instead. (*Id.* at 26). Dr. Chase's notes reflect his instant disagreement with the decision; he wrote, "I have a feeling we will be revisiting" the denial of a CT scan. (*Id.*; Pl.'s Ex. F, ECF No. 40-6). At this point, Powers weighed 265 pounds, up from 258 pounds at the time of his first visit with Dr. Chase at the start of October. (Def.'s Ex. D at 27, ECF No. 32-4). The ultrasound showed no signs of hernia obstruction, strangulation, or incarceration. (*See id.* at 25, 31). Dr. Chase, reviewing the ultrasound results on January 3, 2019, found that the "normal" finding from the ultrasound was "at significant odds with physical exam (and photos)" and restated his belief that a "surgical followup for final disposition" was needed. (Pl.'s Ex. H at 4, ECF No. 40-8). In line with that belief, the ultrasound report, signed by Dr. Gregory Russo, noted that if "[p]ain persists or worsens, further

---

[5] The parties variously refer to the "Complex Hernia Clinic" and the "Complex Hernia Group"; it appears that these refer to the Abdominal Wall Hernia Repair group within the Center for Abdominal Core Health.

evaluation with a contrast-enhanced CT scan of the abdomen and pelvis is recommended." (Def.'s Ex. D at 25, ECF No. 32-4).

Powers did not receive further evaluation with a CT scan, despite continued requests. Dr. Chase asked for a surgery follow-up on January 10, 2019, which was rejected. (*See* Pl.'s Ex. H at 4, ECF No. 40-8; Def.'s Ex. D at 31, ECF No. 32-4). Similarly, Dr. Katz's recommendation that the hernia be evaluated by the Complex Hernia Clinic at OSU was rejected by Collegial Review on January 17, 2019. (Def.'s Ex. D at 33, ECF No. 32-4; Def.'s Mot. for Summ. J. at 8, ECF No. 32). Defendant asserts that the request was denied based on a finding that the hernia was reducible, that it was not at risk of becoming incarcerated or strangulated, and that surgery would be unduly risky due to Powers' comorbidities and weight. There is, however, no evidence presented or identified by Defendant of the decision-making process of Collegial Review, and thus no record of what factors were evaluated or considered dispositive for the decisions to deny the CT scan or surgical follow-ups.[6] And though the hernia may still have been reducible, it had continued to grow rapidly to alarming proportions. (*See* Pl.'s Ex. I at 1, ECF No. 40-9) (noting that Powers' description that "the hernia started as baseball sized, grew to football sized and is now basketball sized" was "perhaps a little hypobole [sic] but not far off"). In lieu of a surgical follow-up or a CT scan, an abdominal binder was ordered for Powers. (Def.'s Ex. D at 33, ECF No. 32-4). Additionally, Dr. Chase's continued requests for a surgical follow-up allegedly prompted Dr. Eddy to drop in for a visit, during which Dr. Eddy accused Dr. Chase of making him look bad and then asked Dr. Chase if he would consider retiring from ODRC. (Chase Decl. ¶ 10, ECF No. 40-2). Dr. Chase believes that he was later fired for refusing to retire and for his repeated requests for

---

[6] For example, Defendant cites to Dr. Chase's notes from January 17, 2019, in which neither the risks of surgery nor the possibility that the hernia would be reducible, incarcerated, or strangulated are mentioned. (*See* Def.'s Ex. D at 33–34, ECF No. 32-4).

treatment for Powers, though Dr. Eddy asserts that Dr. Chase was terminated for other reasons (specifically, refusing to provide full disclosure of treatment risks to his patients) and disputes ever accusing Dr. Chase of making him look bad.  (*See id.*; Decl. of Dr. Andrew Eddy ("Eddy Decl.") ¶ 7, ECF No. 42-1).

Over the following months, Powers' hernia continued to grow and his health continued to deteriorate.  By February 12, 2019, the hernia "occupie[d] much of the entire right abdomen" and was "[t]ruly the size of a football."  (Def.'s Ex. D at 35, ECF No. 32-4).  Powers also continued to gain weight, clocking in at 275 pounds on February 12, 2019, which led  Dr. Chase to advise Powers about the necessity of a better diet and exercise during this period.  (*See, e.g.*, Def's Ex. D at 30, ECF No. 32-4; *id.* at 1 (noting that, as of April 2019, Powers had spent $2500.00 "in the past 14 months on a large volume of junk foods")).  But Powers' ability to walk, let alone engage in active exercise, had been compromised by the hernia, and he was diagnosed with diabetes on December 20, 2019.  (*See id.* at 35, 83).

Eventually, after Powers reached out to his present counsel at Ohio Justice and Policy Center ("OJPC"), Powers was seen by Dr. Katz at Franklin Medical Center in August 2020.  (*See id.* at 24).  Dr. Katz concluded that the hernia was "likely inoperable with the expectation of good results" because of Powers' comorbidities and possible complications involving his COPD.  (*Id.*).  Dr. Katz did recommend that Powers be seen at OSU for surgical consult.  And thus, on September 30, 2020, he finally received a CTA scan at the Wexner Medical Center.[7]  (*Id.* at 86–87).  Dr. Katz then saw Powers again on November 9, 2020, at which time he assessed that the hernia "seems to have lost the right of domain."  (*Id.* at 20).  Later visits, with Dr. Lindsey on January 11, 2021, and

---

[7] A computed tomography angiography (or "CTA") scan is a variation of a CT scan that combines a CT scan with a special dye or contrast intended to highlight arteries or veins.

with Dr. Eiferman on March 24, 2022, confirmed the prognosis that Powers would not be a good candidate for hernia reduction surgery.  (*See id.* at 83).  One key concern with any potential operation was Powers' weight: Dr. Lindsey told Powers that he would need to lose at least 30 pounds, down to 252 pounds, to even be considered for surgery.  (Report of Dr. David Lindsey ("Lindsey Report") at 1, ECF No. 32-3; *see also* Report of Dr. Daniel Eiferman ("Eiferman Report") at 2, ECF No. 32-2 (suggesting that the target weight for the surgery was "258 pounds with a BMI no higher than 35").  But Powers was unable to do so.  (*See* Lindsey Report at 1, ECF No. 32-3).  And, according to Drs. Lindsey and Eiferman, even if Powers lost the necessary weight, the surgery would still be extremely complex and risky, with only a 40% success rate over a five-year period and a litany of possible accompanying complications.  (*Id.* at 1–2).

As of May 2022, it remains uncertain whether the surgery would be successful without posing unacceptable risks to Powers' health.  (*See* Eiferman Report at 2, ECF No. 32-2).  The hernia is likely beyond repair, leaving Powers to suffer for the rest of his life; he cannot walk without the aid of a walker, experiences severe pain in his back and groin, and suffers from frequent, painful constipation.[8]  (Deposition of Floyd Powers ("Powers Dep.") 31:4–7, 135:14–136:2, ECF No. 41).

---

[8] Defendant suggests that Powers has not lost much quality of life, because he can still "shower, climb stairs, walk outside, sit, read, go to classes, work as a tutor, drink his coffee in the yard, participate in religious services, celebrate the holidays, attend musical concerts, shop the commissary, and cook his own meals."  (Def.'s Reply Br. at 16, ECF No. 42) (citing Powers Dep. 49–52, 116, 117–19, ECF No. 41).  To clarify, Powers can only walk with the assistance of a walker, shower by sitting down, and climb stairs with the assistance of the handrail; he cannot do any of these things while standing on his own.  (*See* Powers Dep. 31:4–7, 116:9–15, ECF No. 41).  Additionally, Defendant's representation that Powers' biggest concern is that "he is unable to sleep on the side of the hernia, his clothes fit poorly, and he develops skin tears at the inferior aspect of the wound" accurately captures what he told Dr. Eiferman at one time but ignores his testimony that he experiences daily pain that registers as an eight out of ten.  (*Id.* 135:20–24).

## B.     Procedural Background

Plaintiff filed an Informal Complaint Resolution ("ICR") on April 23, 2019, the first step of the grievance procedure at ODRC.  (Compl. ¶ 41, ECF No. 1).  When the ICR was not resolved to Plaintiff's satisfaction, he filed a Notification of Grievance on April 26, 2019.  (*Id.* ¶ 42).  When that, too, was not resolved to Plaintiff's satisfaction, he appealed the denial of his grievance to the Office of the Chief Inspector, who denied his appeal on July 16, 2019, thus exhausting his administrative remedies as required under 42 U.S.C. § 1997e(a).  (*Id.* ¶¶ 43–44).  Plaintiff then filed suit in this Court on March 19, 2021, alleging that Defendant Dr. Andrew Eddy violated 42 U.S.C. § 1983 by acting with deliberate indifference to Mr. Powers' medical issues.  (Compl. ¶ 45, ECF No. 1).  On August 15, 2022, Defendant filed his Motion for Summary Judgment (ECF No. 32), which is now ripe for this Court's review.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) states that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  The Court must view the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in the non-movant's favor.  *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citing *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)).  This Court then asks "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986)).  Summary judgment is inappropriate, however, "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248.  Evidence that is "merely colorable" or "not

significantly probative" is not enough to defeat a motion for summary judgment, *id.* at 249–50, nor is "[t]he mere existence of a scintilla of evidence to support [the non-moving party's] position" sufficient. *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson*, 477 U.S. at 251.

The initial burden rests upon the movant to present the Court with law and argument in support of its motion, and to identify the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there remains a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (noting that after the burden shifts, the nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

## III.    LAW & ANALYSIS

Plaintiff Powers brings this § 1983 claim for deliberate indifference to his serious medical needs between November 2018 and April 2019. Before addressing the merits of his claim, the Court first discusses Defendant Dr. Eddy's affirmative defense that the claim is barred by the statute of limitations.

### A.    Statute of Limitations

As an initial matter, Dr. Eddy asserts that any claim of deliberate indifference with regards to events prior to March 19, 2019, are time-barred by the relevant statute of limitations. (Def.'s Mot. for Summ. J. at 5–6, ECF No. 32). This includes, *inter alia*, his role in the Collegial Review decisions that denied Dr. Sun's request (as ratified by Dr. Katz) for a CT scan on November 26,

8

2018, Dr. Katz's request for a surgical follow up on January 17, 2019, and Dr. Chase's repeated requests for surgical follow ups between November 2018 and April 2019.

It is a well-settled principle that "a prerequisite to bringing a § 1983 claim . . . is that it must be brought within the applicable statute of limitations period." *Hollis v. Erdos*, 480 F. Supp. 3d 823, 829 (S.D. Ohio 2020). When the period begins to run is a question of federal law, but state law governs the length of the statute of limitations period. *See Wallace v. Kato*, 549 U.S. 384, 388 (2007). And under Ohio state law, "the appropriate statute of limitations for 42 U.S.C. § 1983 civil rights actions . . . is contained in Ohio Rev. Code § 2305.10, which requires that all actions for bodily injury be filed within two years after their accrual." *Browning v. Pendleton*, 869 F.2d 989, 992 (6th Cir. 1989) (en banc). Dr. Eddy seeks to bar claims regarding any events prior to two years before the Complaint was filed on March 19, 2021, on the basis that the alleged denials of medical care were discrete events and did not constitute continuing violations.

The Court need not address the issue of whether the denial of medical care in this case establishes a continuing violation, *see Eidson v. State of Tennessee Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007) (discussing allegations of inaction without "affirmative acts"); *cf. Tolbert v. State of Ohio Dep't of Transp.*, 172 F.3d 934, 941 (finding that continuing adherence to a decision without "systematically repeatedly revisit[ing]" it does not present a continuing violation); *Jervis v. Mitcheff*, 258 F. App'x 3, 5–6 (7th Cir. 2007) ("Deliberate indifference to a serious medical need is a continuing violation that accrues when the defendant has notice of the untreated condition and ends only when treatment is provided or the inmate is released." (citing *Heard v. Sheahan*, 253 F.3d 316, 318–19 (7th Cir. 2001)), to resolve this issue. This is because, under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, which applies to all "federal claims seeking redress for prison circumstances occurrences," *Lee v. Wiley*, 789 F.3d 673, 677 (6th

Cir. 2015), such as Powers' claim, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined to any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). In other words, the PLRA requires that a prisoner exhaust her administrative remedies before filing her claim in federal court. *See Brown v. Morgan*, 209 F.3d 595, 596 (6th Cir. 2000); *see also Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012) (noting that the failure to exhaust "is an affirmative defense under the PLRA" (quoting *Jones v. Bock*, 549 U.S. 199, 216 (2007)).

Accordingly, the two-year statute of limitations for § 1983 claims filed by Ohio prisoners is "tolled while the plaintiff exhausts his required administrative remedies." *Surles*, 678 F.3d at 458 (citing *Brown*, 209 F.3d at 596). As the statute of limitations issue is an affirmative defense, a § 1983 defendant like Dr. Eddy bears the burden of proof to show that the claims "were untimely even after tolling for the period during which [Powers] was exhausting his administrative remedies." *Id.* Here, Dr. Eddy has presented no evidence to that effect.[9] The Court therefore concludes that the statute of limitations defense is inapplicable in this case. The two-year filing period for Powers' § 1983 claim was tolled until he exhausted his administrative remedies on July 16, 2019; as his Complaint was filed within two years of the date of exhaustion, his claims arising from events prior to March 2019 are not time-barred.

## B.    Deliberate Indifference

Section 1983 authorizes a federal cause of action for deprivations of rights secured by the Constitution or laws of the United States caused by a person acting under the color of state law.

---

[9] The absence of any rebuttal on this topic in Dr. Eddy's Reply Brief suggests that he has abandoned this defense. (*See generally* Def.'s Reply Br., ECF No. 42).

*Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015).  The constitutional right implicated in this case is the Eighth Amendment's protection against cruel and unusual punishment—in the form of deliberate indifference to an inmate's serious medical need.  *See Farmer v. Brennan*, 511 U.S. 825, 834–35 (1994); *see also Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (noting the government's "obligation to provide medical care for those whom it is punishing by incarceration").  A claim of deliberate indifference "requires proof that the inmate had a sufficiently serious medical need and that a municipal actor knew of and disregarded an excessive risk to the inmate's health or safety."  *North v. Cuyahoga Cnty.*, 754 F. App'x 380, 385 (6th Cir. 2018) (citing *Winkler v. Madison Cnty.*, 893 F.3d 877, 890–91 (6th Cir. 2018)).  There are two components that a plaintiff must establish: first, an objective component, "that the alleged deprivation of medical care was serious enough to violate the Eight Amendment," *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (citing *Farmer*, 511 U.S. at 834); and second, a subjective component, that the official had a "sufficiently culpable state of mind."  *Famer*, 511 U.S. at 834.  The Court addresses each component in turn.

### 1.    Objective Prong

The objective component requires a plaintiff to show that she had "a sufficiently serious medical need such that she is incarcerated under conditions posing a substantial risk of serious harm."  *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008) (citation and internal quotation marks omitted).  The plaintiff can do so by first demonstrating that her medical need "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *North*, 754 F. App'x at 385 (quoting *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010)).  If a plaintiff can establish a "sufficiently serious medical need," she must then show that "the prison failed to provide

11

treatment or [] provided treatment so cursory as to amount to no treatment at all." *Rhinehart*, 894 F.3d at 737 (citations and internal quotations marks omitted). But if "an inmate has received on-going treatment" for a serious medical need but "claims that this treatment was inadequate, the objective component of an Eighth Amendment claim requires a showing of care 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id.* (citing *Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005)). In that case, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (quoting *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001)).

Dr. Eddy suggests that there were only two risks he was aware of during the relevant time, neither one of which was serious: (1) the risk that the hernia would become strangulated or incarcerated; and (2) the risks associated with surgical repair. (Def.'s Mot. for Summ. J. at 16, ECF No. 32). But this framing of the issue neglects the basic fact that Powers was suffering from a deteriorating and rapidly growing hernia, which was having serious effects on his qualify of life. Between October 2018 and the spring of 2019, his hernia had grown from a mere bulge to football-sized, then further to basketball-sized, and was causing him severe pain for hours each day. Multiple physicians and surgeons recognized the need that the growing hernia posed a serious risk to his well-being and quality of life. And beyond the fact that doctors had requested further treatment, the abnormally large size of the growing hernia presented a medical problem "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Burwell v. City of Lansing*, 7 F.4th 456, 463 (6th Cir. 2021) (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004)). It does not appear that Dr. Eddy truly disputes that the incisional hernia presented a sufficiently serious medical need. (*See, e.g.*, Def.'s Reply Br. at 15,

12

ECF No. 42 (disputing the need for a CT scan but not for treatment); *id.* at 17 (arguing that the risks of surgery were greater than the risks of letting the hernia grow unabated)).  Severe pain, constipation, and the loss of mobility are all sufficient serious medical concerns.

The true thrust of Dr. Eddy's dispute about the objective component lies elsewhere.  He argues that, because Powers was provided with ongoing treatment rather than no treatment for the hernia, Powers must put forward "medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain."  (Def.'s Reply Br. at 3, ECF No. 42) (quoting *Rhinehart*, 894 F.3d at 737 (citation and internal quotation marks omitted)).  Such proof will "often require 'expert medical testimony . . . showing the medical necessity for' the desired treatment and 'the inadequacy of the treatments' the inmate received."  (*Id.*) (quoting *Rhinehart*, 894 F.3d at 737 (quoting *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017))).  According to Dr. Eddy, Powers has failed to provide such expert evidence demonstrating the inadequacy of the conservative treatment plan that Dr. Eddy authorized.  (*See id.* at 3).

This case presents a slight variation on the typical § 1983 deliberate indifference to medical need case, wherein a prisoner alleges that her treating physician ignored or provided inadequate treatment.  *See, e.g.*, *Rhinehart*, 894 F.3d at 729, 732 (discussing appointments the plaintiff had with the two defendant doctors).  Dr. Eddy, on the other hand, never directly treated Powers, but rather reviewed other physicians' requests for specialty consultations and treatment for Powers and then denied or authorized those requests.  *See Mabry v. Antonini*, 289 F. App'x 895, 903 (6th Cir. 2008).  During the period from mid-November 2018 to April 2019, Collegial Review—and, by extension, Dr. Eddy—denied Dr. Sun and Dr. Chase's requests for a CT scan and denied Dr.

Katz and Dr. Chase's requests for a surgical follow-up, and instead authorized an ultrasound.[10] Collegial Review does not have a role, on the other hand, in how the prison doctors their patients internally, and thus its stamp of approval was not necessary for providing abdominal binders, doctor's appointments, or counseling to Powers within LCI; Dr. Eddy has not proffered evidence that he played a role in any aspect of that course of care. Thus, drawing inferences in favor of the non-movant, the assertion that Dr. Eddy "prescribed" a "conservative treatment plan" for Powers appears to be a stretch when, in reality, his role consisted primarily of denying all requests for treatment and did not include any active participation in Dr. Chase's continuing efforts to care for Powers.

And with respect to the ultrasound, Powers suggests that Dr. Eddy's decision constitutes treatment "so woefully inadequate as to amount to no treatment at all." *Richmond v. Huq*, 885 F.3d 928, 939 (6th Cir. 2018) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). The Sixth Circuit has found, for example, that a nurse who provided a cursory examination of a patient with severe exhaustion and returned him to his non-air conditioned cell with nothing more than an instruction to drink water and take aspirin was found to have provided, in effect, no treatment at all. *Dominguez*, 555 F.3d at 550–51. Similarly, a doctor has provided a cursory treatment where he knows that the treatment plan would be inadequate. *See Helphenstine v. Lewis Cnty.*, 2023 WL 1859890, at *11 (6th Cir. Feb. 9, 2023); *see also Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)). *But see Rhinehart*, 894 F.3d at 739 (concluding that "this is not a case involving cursory treatment amounting to no treatment at all"

---

[10] The record also shows that Collegial Review approved a surgery consult in late 2020, outside the time frame of Powers' allegations. (*See* Def.'s Ex. D at 82, ECF No. 32-4).

where the prisoner had regular appointments with the defendant doctors, underwent a plethora of lab tests, and received medication and specialist treatment).

The contemporaneous medical records provide sufficient evidence for a rational factfinder to conclude that the only treatment Dr. Eddy authorized was ineffective from the beginning, and denied all other requested treatments despite the ineffectiveness. After all, Drs. Sun and Katz had concluded that a more aggressive plan than just monitoring was necessary to treat the growing hernia. To that end, they had requested a CT scan, not an ultrasound, to determine the next steps for treatment. (*See* Pl.'s Ex. D at 4, ECF No. 40-4). When Dr. Eddy authorized an ultrasound instead of a CT scan, Dr. Chase immediately noted the inadequacies he perceived with the decision, and indicated that he had "a feeling we will be revisiting this" because the ultrasound would not provide relevant information. (Def.'s Ex. D at 26, ECF No. 32-4). And, in fact, when the ultrasound came back, Dr. Chase wrote that "the US findings [are] at significant odds with physical exam (and photos)," indicating that he did not find the ultrasound to be helpful or credible in its assessment of the hernia. (Def.'s Ex. D at 31, ECF No. 32-4). This is not to say that the ultrasound had no purpose, as it shed some insight on the state of Powers' hernia, but simply that it provided no help towards stemming the hernia's growth. Moreover, after the ultrasound, even as Powers' hernia continued to grow and worsen, Dr. Eddy repeatedly rejected requests for a different course of treatment. *Cf. Darrah v. Krisher*, 865 F.3d 361, 370 (6th Cir. 2017) (finding that "the question of whether it was reasonable to continue to keep [a prisoner] on [a particular course of treatment] that had proven ineffective and whether that course of treatment constituted deliberate indifference is a question best suited for a jury").

In other words, drawing all inferences in favor of the non-movant, Powers has sufficiently shown that Dr. Eddy's repeated denial of requests from prison and outside doctors his and

15

authorization of an unhelpful procedure could "amount to no care at all" in the face of a serious medical need, thus establishing the objective component of deliberate indifference.

2.    *Subjective Prong*

The subjective component of a deliberate indifference claim requires a plaintiff to show that the defendant did not merely make a mistake in medical judgment or act negligently, *see Estelle*, 429 U.S. at 107–08, but rather "acted with a mental state 'equivalent to criminal recklessness'"—in other words, that the defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk' by failing to take reasonable measures to abate it." *Rhinehart*, 894 F.3d at 738 (first quoting *Santiago*, 734 F.3d at 491; then quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).   The bar here is high.   Out of deference to the judgments of medical professionals, a § 1983 claim requires a showing that the plaintiff's "serious medical needs were consciously disregarded." *Richmond*, 885 F.3d at 940 (citing *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001)).

Dr. Eddy does not appear to dispute that he was aware of the risk of the hernia to Powers— that he knew the facts of Powers' case and inferred that there was a substantial risk.   (*See, e.g.*, Def.'s Mot. for Summ. J. at 18–19, ECF No. 32) (arguing that "no jury could find that Dr. Eddy acted intentionally to ignore Mr. Powers' serious medical need").   Indeed, Dr. Eddy had reviewed Dr. Chase's notes as part of his Collegial Review duties, and was aware of both Powers' deteriorating condition and the risks associated with untreated hernias.   (*See* Pl.'s Resp. in Opp'n at 12–13,[11] ECF No. 40).   He was aware, too, that hernias can become life-threatening and can

---

[11] Here, Powers cites to the deposition of Dr. Eddy, which has not been filed by either party on the docket. Dr. Eddy does not dispute the assertions for which Powers cites his deposition.

permanently reduce a patient's quality of life, and that they do not self-repair.  (*Id.*).  But Dr. Eddy asserts that he acted reasonably in the face of that risk.  (*See* Def.'s Reply Br. at 6–8, ECF No. 42).

In support of his position, he argues that he acted in accordance with the conclusions of Drs. Sun, Katz, Lindsey, and Eiferman, none of whom advocated for surgery to treat the hernia because they all recognized that the risk of surgery was too great—or so he claims.  (*Id.* at 4, 6, 9).  But Dr. Sun's notes from the November 26, 2018, visit, which were reviewed with Dr. Katz, belie this assertion.  In those notes, Dr. Sun explicitly recommended a CT for surgical planning and further discussed what Powers needs to do once he was scheduled for surgery.  A rational factfinder could very well conclude from these notes that Dr. Sun was recommending surgery and not simply seeking to evaluate the feasibility of a surgical repair.  (*See* Def.'s Reply Br. at 5, ECF No. 42).  A rational factfinder could also conclude that Dr. Katz's ratification of Dr. Sun's recommendation supports a finding that Dr. Katz also recommended surgery.

The more fundamental problem is that he has not produced evidence that the reasons he now claims justified his decision-making, as explained in the expert opinions prepared by Drs. Lindsey and Eiferman, were in fact the same why he denied the requests of Drs. Sun, Katz, and Chase in late 2018 and early 2019.  *See Rhinehart*, 894 F.3d at 761 (Moore, J., concurring in part and dissenting in part) ("If a rational factfinder could conclude that [the defendant doctor's] justification for denying [the prisoner] a [] procedure was mere pretext to mask deliberate indifference, then summary judgment is improper.").  Instead, some of the reasons he now proffers may in fact be post hoc justifications, based on factors not reflected in the contemporaneous records made by other doctors as they treated Powers.  On the Court's read, Dr. Eddy asserts that there were three primary reasons for why he denied the CT scan and surgical follow-up requests:

17

Powers' obesity, the risks of surgery, and the unlikelihood of strangulation.  (*See* Def.'s Mot. for Summ. J. at 2, 3, ECF No. 32).

First, Dr. Eddy argues that Powers' weight has, from the inception of the hernia, precluded him from receiving a hernia reduction problem.  (*See, e.g.*, Def.'s Reply Br. at 15, ECF No. 42). He provides expert opinions from Dr. Eiferman and Dr. Lindsey to the same effect.  (*See* Def.'s Ex. B ¶ 5, ECF No. 32-2; Def.'s Ex. C at 1, ECF No. 32-3).  It is true that, since at least November 2018, Powers' weight has not dropped below the target weight that Dr. Lindsey set for him to be reevaluated for surgery.  But that target weight was set by Dr. Lindsey when Powers visited him on January 11, 2021, two years after the allegations at issue.  Dr. Eddy has not put forward evidence suggesting that he was aware in late 2018 or early 2019 that hernia surgeons like Dr. Eiferman or Dr. Lindsey had a target weight in mind or that Powers' weight was above that target.  Perhaps he already had an awareness of that concern from his medical background, but—if he did—nothing in the record reflects that awareness.[12]  Moreover, if Collegial Review had deemed Powers too obese to undergo hernia reduction strategy, it is odd that Dr. Chase was never informed of that concern or advised to talk to Powers about losing weight down to the target for surgery.

Second, Dr. Eddy claims that his decision to reject the request for a surgical follow-up on January 17, 2019, was informed by the fact that Powers' hernia did not present risks of strangulation or incarceration.  On this point, Dr. Eddy's claims are supported by evidence in the record: the ultrasound he ordered in lieu of a CT scan showed no abnormalities, indicating that

---

[12] In Dr. Eddy's opinion report, he states that one of the documents he reviewed was Dr. Chase's notes from seeing Powers on January 17, 2019.  (Def.'s Ex. A at 5, ECF No. 32-1).  His summary of those notes states: "Patient educated on the plan of care, namely weight loss via diet and binder since this is elective surgery and risks are greater than benefit due to comorbidities and weight."  (*Id.*).  But Dr. Chase's actual notes, upon which this summary is based, make no mention of a Collegial Review decision that mentions a concern about surgery risks or obesity.  (Def.'s Ex. D at 33–34, ECF No. 32-4).  Again, it is possible that Dr. Eddy's May 2022 summary of Dr. Chase's notes represents his true thought process in January 2019, but it is not reflected in any contemporaneous records.

18

there were no signs of strangulation or incarceration.  The only evidence Powers has presented in dispute is Dr. Chase's recollection that the readings from the ultrasound "were so deficient that they showed virtually nothing."  (Pl.'s Ex. B ¶ 8, ECF No. 40-2).  But Powers does not point to any evidence that his hernia was at risk of becoming strangulated at that point.

Third, Dr. Eddy suggests that he did not authorize any steps in preparation of surgery because, "even if Mr. Powers were able to achieve his target weight, elective surgery may still [have been] too risky" with "only a 40-50% chance" of success.  (Def.'s Mot. for Summ. J. at 3, ECF No. 32).  Here, again, Dr. Eddy relies on present-day conclusions about the potential outcomes of surgery without demonstrating that these were concerns he had, or was aware of, at the time.  The primary complicating factor preventing a successful surgery, according to Dr. Eddy, is the loss of abdominal wall (also referred to as the loss of domain),[13] which resulted from the 2018 appendectomy and the subsequent inadequate healing of the right anterior rectus muscle. (*See id.* at 3; Eiferman Report at 2, ECF No. 32-2) ("Even if Mr. Powers were able to achieve his target weight . . . such massive abdominal wall reconstruction may still be determined to be too risky due to the loss of integrity of Mr. Powers' abdominal wall.").  The first mention of a "loss of domain" in Powers' medical records, however, does not occur until Dr. Katz's notes dated November 9, 2020, after Powers had finally received a CT scan on September 30, 2020.  (Def.'s Ex. D at 20, ECF No. 32-4; *see id.* at 86).  By contrast, there is no mention in the notes of Dr. Sun or Dr. Katz from November 26, 2019, that Powers had lost his abdominal wall or domain issue. As late as December 2018, based on the ultrasound that Dr. Eddy authorized, the "overlying abdominal wall appear[ed] intact."  (*Id.* at 25).  Thus, a rational factfinder could conclude that Dr.

---

[13] Other complicating factors included Powers' COPD and atrial fibrillation, both of which were noted throughout in his medical records.

Eddy's claimed concerns about the loss of domain as a complicating factor for the surgery were pretext, since the evidence does not reflect any other doctor's awareness of that issue until after a CT scan had been done in 2020.

It is of little import that Powers was not informed of the risks of surgery by Drs. Sun, Katz, or Chase, or that Powers' hernia has not worsened so substantially that he is fully bed-ridden.  The Court's analysis of the subjective component neither turns on the patient's contemporaneous knowledge of medical treatment options nor requires a plaintiff to have suffered a catastrophic harm.  *See Blackmore*, 390 F.3d at 898 (noting that "[a] determination that [the prisoner's] appendix ruptured is not a prerequisite for his Eighth Amendment right to avoid pain from the officers' deliberate indifference to his obvious need for medical care").  Rather, the issue is whether Dr. Eddy's reasons for his decisions at the time he made those decisions evinced a conscious disregard for substantial risk of serious harm.  On that point, there is sufficient evidence in the record for a rational factfinder to conclude that at least some of the key facts that Dr. Eddy now claims he "perceived" when he ordered the ultrasound instead of the CT and denied the surgical follow-up requests were not in fact known to him at the time.  Only a year-and-a-half later was the loss of abdominal wall first mentioned in Powers' records (after a CT was performed) and only two years later was Powers set a weight loss target vis-à-vis surgery; the surgeons who did see and treat Powers in November 2018 were, apparently, blind to the concerns that Dr. Eddy, who did not examine Powers, purportedly perceived.  While the exercise of medical judgment does not constitute "conscious disregard," medical judgment must still be based on reasons and known facts; without such evidence, a jury may determine that the decision was not a legitimate exercise of medical judgment.  *See also Jackson v. Corizon Health Inc.*, 596 F. Supp. 3d 834, 839 (E.D. Mich. 2022).

20

As the record poses genuine disputes of material fact as to whether Dr. Eddy's decisions provided only cursory treatment or entailed the exercise of medical judgment, a jury could reasonably conclude that Powers has established both the objective and subjective components of his deliberate indifference claim.

## C. Qualified Immunity

The Court must also address the issue of qualified immunity, which "shields officials from civil liability if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Darrah*, 865 F.3d at 374 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The first step in the qualified immunity analysis looks to "whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310–11 (6th Cir. 2005) (citing *Saucier v. Katz*, 553 U.S. 194, 201 (2001)). The Court has already concluded that this step is satisfied.

The second step asks "whether that right was clearly established," *Darrah*, 865 F.3d at 374, which requires "[t]he contours of the right [to] be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)). Dr. Eddy frames this inquiry as "whether the Eighth Amendment requires a surgical repair of a reducible hernia in the face of inordinate risks." (Def.'s Reply Br. at 20, ECF No. 42). But the inquiry is not so narrow: rather, it is enough that it was "clearly established" in 2018 that "choosing to prescribe an arguably less efficacious treatment method[] and continuing on a treatment path that was clearly ineffective could constitute a constitutional violation." *Darrah*, 865 F.3d at 374  After all, that is the crux of Powers' allegations: that Dr. Eddy chose a clearly inadequate treatment and persisted with denying further treatment in the face

of a worsening condition. Thus, as this case presents allegations that Powers' serious medical needs were neglected—*i.e.*, a clearly established violation of his Eighth Amendment rights—qualified immunity is not appropriate.

### IV. CONCLUSION

For the reasons stated more fully above, this Court **DENIES** Defendant's Motion for Summary Judgment (ECF No. 32).

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE: March 27, 2023**